Filed 12/9/25  P. v. Villagomez CA5

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JESUS VILLAGOMEZ,<br><br>Defendant and Appellant. | F088725<br><br>(Super. Ct. No. VCF349094B)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Melinda Myrle Reed, Judge.

James Bisnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary, Lewis A. Martinez and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Petitioner Jesus Villagomez petitioned the superior court, pursuant to former section 1170.95 (now § 1172.6) of the Penal Code,[1] for resentencing on four counts of attempted murder (§§ 187, subd. (a), 664). The trial court conducted an evidentiary hearing and denied the petition on the ground petitioner was the actual shooter.

On appeal, petitioner contends the evidence does not support a finding that he intended to kill the victims, as required to support his convictions. We affirm.

**FACTUAL BACKGROUND**

The charges in this case arise from two drive-by shootings that occurred on different days outside the home of B.J.[2] in Orosi.

## I.  Law Enforcement Investigation

On March 24, 2017, Detective M. Rascon[3] was informed of a drive-by shooting at a residence in Orosi and received information about the involved car and a potential suspect, a Norteño from Orosi who went by the moniker of "Bubba." Rascon knew, through prior contacts with petitioner, that he used the moniker, Bubba. Rascon drove by petitioner's residence and saw a green Honda parked outside.

Rascon then went to the location of the shooting, which he identified as B.J.'s residence, to obtain more information. Rascon first spoke with O.I., who reported he believed he was the target of the shooting due to his Sureño association.[4] O.I. pointed out

---

[1] Undesignated statutory references are to the Penal Code. The petition referred to former section 1170.95. However, prior to the filing of the petition, former section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We refer to the current section 1172.6 in this opinion.

[2] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

[3] The parties stipulated, for purposes of the preliminary hearing, that Rascon was a properly qualified gang expert.

[4] Both the People and petitioner include in their statements of facts out-of-court statements made by others to Rascon. Section 1172.6, subdivision (d)(3) prohibits

to Rascon areas in the dirt that he believed were impact marks from bullets and reported he believed he was struck by projectiles. These impact marks were located three to five feet away from where O.I. and B.J. were standing just before the shooting started. O.I. was not able to identify anyone in the car and reported the shooter had a cloth covering the bottom portion of his face. O.I. reported the involved firearm was a chrome handgun but could not state whether it was semiautomatic or a revolver.

Rascon next spoke with B.J., who reported that an early model green Honda had driven by his home earlier that day while he was home with B.P., who B.J. identified as his cousin. The vehicle stopped perpendicular to his residence and the individuals inside taunted him and yelled out gang slurs to provoke him to come out to the street. He described the vehicle as "packed" and reported the people in the car were spelling out "NSO," which Rascon understood to mean "North Side Orosi," and making derogatory comments regarding Sureño gang members. B.J. tried to avoid confrontation by walking back to his house because he was considering his family inside the residence. At that point the vehicle drove away.

B.J. reported that O.I. arrived after the vehicle left and they went into a small room outside the residence. They heard a vehicle drive in front of the house and went out to see what was going on. They saw the green Honda reverse and the rear driver's side door opened. The rear driver's side passenger, who had a mask over his face, produced a handgun and shot two to four times in the direction of B.J. and O.I. B.J. recognized the driver and shooter as the same driver and shooter as in a shooting incident which occurred at B.J.'s residence on February 22, 2017. B.J. reported that, on that date, he was

_____

consideration of preliminary hearing testimony admitted pursuant to subdivision (b) of section 872 unless the evidence is admissible pursuant to another exception to the hearsay rule. Here, it appears the statements were admitted at the preliminary hearing pursuant to Evidence Code section 770 as prior inconsistent statements. Neither party objects to our consideration of these statements.

in his yard raking leaves when the green car turned onto his street, at which point the front passenger "threw up" gang signs and fired a handgun in B.J.'s direction.[5]

After "rounds of questioning," B.J. reported that the rear driver's side passenger was petitioner and he gave a description of the driver. B.J. reported to Rascon that he would be able to identify the perpetrator in a photographic lineup but would not testify to his identification. Thereafter, he identified petitioner in a photographic lineup.

B.J. reported he believed his residence was targeted due to his cousins being members of the Big Time Locos Sureños from Orosi.[6] After speaking with his family, B.J. agreed to testify and cooperate as a witness.

Rascon also spoke with B.P., who opined that B.J. and O.I. were targeted because of their association with Sureños. B.P. reported that he first saw the green car park in front of B.J.'s house and the occupants exit the vehicle and act threatening or "showing off" in the street. The vehicle left and returned, at which point one of the occupants fired a black handgun toward B.J. and O.I.

Rascon also spoke with B.J.'s brother, J.J., who reported he went to school with petitioner, who he knew as Bubba, and believed him to be an East Side Orosi Norteño gang member.

Rascon observed the letters "NK" written on the shed in B.J.'s yard, which he described as an abbreviation for "Norteño killa," which is used by Sureños to indicate Norteños are not welcome in the area.

---

[5] B.J. showed Rascon damage to his window caused by the February shooting. B.J. reported his belief that one of the bullets traveled through the window and kitchen wall into his brother's bedroom. However, law enforcement discovered the bullet lodged itself into a stud and did not travel into the bedroom.

[6] The parties stipulated, for purposes of the preliminary hearing, that Sureños and Norteños qualify as criminal street gangs, East Side Orosi is a Norteño subset, and Big Time Locos and Crown Town Locos are Sureño subsets. The parties also stipulated that Norteños and Sureños are rivals.

4.

On March 25, 2017, Rascon made contact with petitioner, Jose Villagomez,[7] Jonathan Mercado, and Emilio Isazaga at Jose's residence. There, Rascon observed a green 1993 Honda Accord parked in front of the residence, with petitioner, Jose, and Isazaga near the trunk of the vehicle, and Mercado near the driver's side door. Law enforcement took B.J. and his wife to Jose's house, where B.J. identified petitioner as the shooter in both incidents. B.J. also identified Mercado as the driver and Isazaga and Jose as being in the car during the March shooting.

Petitioner was arrested after being identified by B.J. as the shooter in both shootings. Upon being arrested, petitioner advised law enforcement that he was an active East Side Orosi Norteño gang member. Gang indicia were located in petitioner's home. Live .22-caliber rounds of ammunition were found inside a "sandwich bag" that was located inside a pair of shoes on a shelf in a covered area outside the home.

In a detached washroom at Jose's house, law enforcement located ammunition and a .357 revolver with a black metallic finish that, under the light, would "shine and glisten" in one angle and "darken in the other." The revolver had four live rounds in the chamber, plus a bullet that was stuck and had not fired. Ballistics tests were not done on the gun to determine whether it was recently fired. No shell casings were found at the scene. Because the Smith and Wesson 586 model does not extract a shell casing once a projectile is fired, the lack of shell casings at the scene would be consistent with a .357 being used in the shooting.

A search of petitioner's phone revealed messages sent on February 22 and February 24, 2017, in which he discussed "popp[ing] a fool" with a .357, or using a .357 to "dump[] at that fool," and shooting at Sureños at a location down the street from a store. Rascon confirmed B.J. lived two or three blocks away from a store. On March 24,

---

[7] We refer to Jose by his first name to avoid confusion with petitioner, his brother, with whom he shares a last name.

2017, petitioner messaged another individual and admitted to using a " 'tray' " in east Orosi and stated the gun was " 'hot.' " Rascon explained that a "tray" is a common term for a .357 and he understood the description of the gun as "hot" to mean it had been used in a crime.

Based on the text messages on petitioner's phone describing using a "tray" on the date of the shooting, coupled with the victim's description of the gun being both dark in color and shiny, Rascon believed the gun recovered from Jose's house was the one used in the shooting.

## II.     Preliminary Hearing Testimony About the February Shooting

B.J. testified that, on or around February 22, 2017, at approximately 11:00 a.m., he was alone in the front yard of his house in Orosi when a green car drove by with two people inside. In court, B.J. identified the front passenger as petitioner, who he identified by the name Bubba, and the driver as Mercado. B.J. believed petitioner and Mercado were northerner gang members because petitioner was holding up gang signs as the car passed by.

The car passed by a second time two to three minutes later. At that point, B.J. saw petitioner with a black semiautomatic firearm, from which he fired approximately five gunshots. B.J. believed he was being shot at. He ducked and went inside his house.

When B.J. came out of his house, the car was gone. B.J. found a bullet hole in a window frame one to two feet away from where he had been standing at the time of the shooting, and another hole where a bullet had gone through the same window and through a wall.

B.J. did not call police after the shooting because he was "not a cop caller" and he felt it was unnecessary because no one was hit.

### III. Preliminary Hearing Testimony About the March Shooting

On the afternoon of March 24, 2017, O.I. went to B.J.'s house after school to get a tattoo. B.P., who B.J. characterized as a friend who is like family, also was at the house. O.I. and B.J. went to a small room on the side of the house next to a shed to work on the tattoo. They spent about an hour in the room, with B.P. coming and going from the room. Around 3:00 p.m., O.I. and B.J. heard a car outside and went to see who it was. At that time, B.P. was next to or behind the shed. B.J. saw the same green car from the prior shooting stop past his house, then slowly reverse. B.J. and O.I. were near a post approximately 15 feet from the car and B.P. was by the shed. The rear passenger door on the driver's side of the car was open. B.J. saw a black handgun, likely a semiautomatic. O.I. and B.P. described the gun as silver or chrome. B.J. and O.I. heard five or six gunshots and ran back to the small room while B.P. ran behind the shed.

After the shooting, B.J. found two or three bullet holes or impact marks in the dirt on the ground and three or four additional bullet holes on some cardboard that was on the fence. B.P. was near the cardboard around the time of the shooting and was approximately three feet from the impact marks on the ground.

O.I. saw the shooter but his face was covered. O.I. could not see any other occupants of the vehicle. B.P. testified that he was unable to identify anyone in the vehicle. B.P. was questioned about, but denied making, numerous statements to law enforcement. He acknowledged telling law enforcement he would be unwilling to testify.

When questioned by officers on the date of the shooting, B.J. reported to law enforcement that petitioner was the shooter. BJ noted that the car was the same car involved in the February shooting. He also identified petitioner in a photographic lineup on the date of the second shooting. He later testified he did not see the shooter's face in the second incident. He nonetheless confirmed petitioner, i.e., Bubba, was the shooter in both incidents. He initially explained he knew this because his wife told him petitioner

was the shooter and acknowledged that he told law enforcement he had seen the shooter's face. He denied that any of the perpetrators had anything on their face during the second shooting. However, he later testified, "Well, now that I remember I do see him with a mask. He had a mask on." He then again confirmed he saw petitioner shoot at him. On cross-examination, he again stated he knew who the shooter was based on what his wife and brother told him.

As to any other occupants of the car, B.J. initially testified that he did not see any. Upon further examination he acknowledged that, at an in-field show-up the day after the shooting, he identified Mercado, Jose, and Isazaga as the other occupants of the back seat. He testified he knew it was them because he had "seen the car," his wife told him it was them, and he "just had a feeling" it was them at the in-field show-up, before eventually acknowledging he had seen them in the car at the time of the shooting.

B.J. acknowledged he has family members in the local area who are Sureño gang members. He formerly was a member of a Sureño gang subset in Los Angeles. O.I. acknowledged that, in middle school, he associated with Sureño gang members and "kind of" considered himself a Sureño, but no longer. O.I. acknowledged he was "hanging out" with Sureños and wearing blue on the date of the shooting. He acknowledged that Sureños wear blue, but asserted his clothing did not "count" because it was not solid, dark blue. O.I. acknowledged that Sureños and Norteños are rivals.

## PROCEDURAL HISTORY

An information filed October 26, 2018, charged petitioner with three counts of attempted murder relating to the attack on B.P., B.J., and O.I. on March 25, 2017, and another count of attempted murder relating to the attack on B.J. on February 22, 2017, (§§ 187, subd. (a), 664; counts 1–3 & 16). Petitioner also was charged with criminal street gang conspiracy (§ 182.5; count 4), street terrorism (former § 186.22, subd. (a); count 5), three counts of maliciously shooting from a vehicle at a person (§ 26100,

8.

subd. (c); counts 6–8), and two counts of conspiracy relating to drug possession for sale (§ 182, subd. (a)(1); counts 17–18).[8] As to counts 1 through 8, the information alleged a personal firearm enhancement pursuant to section 12022.53, subdivisions (b) and (c). As to counts 1 through 8 and 16, the information alleged gang enhancements and sentencing provisions pursuant to section 186.22, subdivision (b)(1)(C), (b)(4) and (b)(5). As to counts 1, 3 through 8, and 16, the information also alleged a vicarious firearm enhancement. (§ 12022.53, subds. (c), (e)(1).) As to counts 17 and 18, the information alleged gang enhancements pursuant to section 186.22, subdivision (b)(1)(A).

On March 21, 2019, petitioner pled no contest to counts 1 through 3, 7, and 16 through 18. As to counts 1 through 3, 7, and 16, petitioner admitted a personal firearm enhancement (§ 12022.53, subd. (c)) and a gang enhancement (§ 186.22, subd. (b)(1)(C)). As to count 18, petitioner admitted a gang enhancement (§ 186.22, subd. (b)(1)(A).) Petitioner was sentenced to an aggregate term of 40 years eight months.

On December 6, 2022, petitioner filed a petition for resentencing pursuant to section 1172.6. The court appointed counsel for petitioner. The court initially denied the petition on the ground petitioner entered his plea after the effective date of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437) and he therefore could not have been convicted under an imputed malice theory. However, the court later vacated its order and agreed to set the matter back on calendar for an evidentiary hearing.[9]

---

[8] Jose, Mercado, and Isazaga were charged in the same information. Counts not discussed herein pertained only to other codefendants.

[9] Based on the date of the order and the court's reference to the appeal of other codefendants, it appears this decision may have been based on this court's ruling in Isazaga's appeal from the denial of a petition for resentencing pursuant to section 1172.6 in *People v. Isazaga* (Oct. 23, 2023, F085643) [nonpub. opn.].

In briefing submitted prior to the evidentiary hearing, the People relied on the evidence adduced at the preliminary hearing to argue petitioner was the actual shooter who personally harbored malice, and that he was ineligible for resentencing on that basis.

The evidentiary hearing was conducted on July 30, 2024. The People confirmed they were relying only on the preliminary hearing transcript and again argued petitioner was ineligible for resentencing as the actual shooter who acted with express malice. Petitioner, through counsel, argued the evidence was equivocal as to whether he was the actual shooter and therefore insufficient to prove his role in the offense.

The court found the preliminary hearing testimony proved beyond a reasonable doubt that petitioner is guilty of four counts of attempted murder as the actual shooter. The court also found the evidence proved beyond a reasonable doubt that defendant shot at the victims because they were members of a rival gang. The court noted petitioner was identified by B.J. as the perpetrator of both shootings, live ammunition matching that used in the second shooting was found at petitioner's residence, and petitioner admitted committing the March shooting in phone conversations after the offense occurred. Finally, the court found there was "no countervailing evidence of substantial weight." Accordingly, the court found petitioner was guilty beyond a reasonable doubt of the offenses charged and denied the petition on that basis.

## DISCUSSION

## I. Section 1172.6 Procedure

Effective January 1, 2019, Senate Bill No. 1437 "altered the substantive law of murder in two areas." (*People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*).) First, the bill narrowed the scope of the felony-murder rule "so that a 'participant in the perpetration or attempted perpetration of a [specified felony] in which a death occurs' can be liable for murder only if '[t]he person was the actual killer'; '[t]he person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced,

10.

solicited, requested, or assisted the actual killer in the commission of murder in the first degree'; or '[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life.' " (*People v. Arellano* (2024) 16 Cal.5th 457, 467–468, quoting § 189, subd. (e)(1)–(3).) Second, the bill "eliminate[d] liability for murder as an aider and abettor under the natural and probable consequences doctrine" by requiring that, "except in cases of felony murder, 'a principal in a crime shall act with malice aforethought' to be convicted of murder." (*Curiel*, at p. 449, quoting § 188, subd. (a)(3).) Now, " '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' " (*Curiel*, at p. 449.)

Additionally, Senate Bill No. 1437 added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of a qualifying offense " 'to seek relief' where the two substantive changes described above affect a defendant's conviction." (*Curiel*, *supra*, 15 Cal.5th at p. 449.) Under section 1172.6, an offender seeking resentencing must first file a petition in the sentencing court, and the sentencing court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1172.6, subds. (a)–(c); accord, *People v. Strong* (2022) 13 Cal.5th 698, 708.) If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order to show cause and hold a hearing to determine whether to vacate the qualifying conviction. (§ 1172.6, subds. (c), (d)(1).)

At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of . . . attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

"Ordinarily, a trial court's denial of a section 1172.6 petition [following an evidentiary hearing] is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

## II. Applicable Law of Attempted Murder

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) For the offense of murder, malice may be express or implied. (§ 188, subd. (a).) However, " '[t]he mental state required for attempted murder has long differed from that required for murder itself.' " (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).) "To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 602.)

"Intent to unlawfully kill and express malice are, in essence, 'one and the same.' " (*Smith*, *supra*, 37 Cal.4th at p. 739.) "Express malice requires a showing that the assailant ' " 'either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' " ' " (*Ibid.*) Because there is rarely direct evidence of a defendant's intent, intent to kill may "be inferred from the defendant's acts and the circumstances of the crime." (*Id.* at p. 741.)

## III. Analysis

Petitioner does not dispute that the evidence establishes he was the actual shooter in this case. Rather, he suggests the evidence does not support a finding he intended to kill the victims and instead suggests he fired a spray of random bullets into the yard. We disagree. We address the evidence supporting each count in turn.

**A.     February 22, 2017, Attempted Murder of B.J.**

The evidence establishes petitioner passed by B.J.'s house holding up gang signs, before returning a few minutes later and firing approximately five gunshots. The evidence does not suggest these gunshots constituted a random spray of bullets. Rather, B.J. believed he was being shot at, and two of the bullets landed in a window or window frame one to two feet from where B.J. was standing. Afterward, petitioner discussed with others shooting at Sureños, "popp[ing]" someone, and "dump[ing]" a gun at someone, suggesting B.J. was the intended target of the shooting. The evidence also establishes B.J. was at least formerly a Sureño gang member, his family was associated with the gang, and petitioner was a rival Norteño gang member.

From these acts and the circumstances of the crime, a reasonable fact finder could draw the inference that petitioner intended to kill B.J. by attempting to shoot directly at him. (*Smith*, *supra*, 37 Cal.4th at p. 742 ["the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice"].) Accordingly, substantial evidence supports the court's finding that petitioner attempted to murder B.J. during the February 22, 2017 shooting.

**B.     March 24, 2017, Attempted Murder of B.J.**

The evidence supporting the March 24, 2017 attempted murder of B.J. is equally compelling. On this date, petitioner returned to B.J.'s residence with a car full of other individuals. The car parked in front of the residence, where the individuals yelled gang slurs and attempted to provoke B.J. to come out to the street. When the car returned a short time later, it reversed toward the residence after B.J. and O.I. came outside, indicating petitioner returned specifically to shoot at B.J., rather than randomly into the yard. B.J. and O.I. were approximately 15 feet from the vehicle, and apparent bullet

13.

impact marks were located on the ground three to five feet from where B.J. and O.I. were standing when the shooting began.

This evidence supports a finding that petitioner returned to B.J.'s residence to carry out a gang-motivated shooting after having failed to shoot B.J. on a prior occasion. The vehicle reversed toward the residence once B.J. was outside, allowing petitioner to shoot at B.J. from relatively close range, missing him once again by mere feet. A trier of fact could reasonably reject an inference that petitioner intended to discharge a random spray of bullets into the yard and could instead find petitioner intended to shoot directly at B.J. to kill him. Accordingly, substantial evidence supports the court's finding that petitioner attempted to murder B.J. during the March 24, 2017 shooting.

### C. March 24, 2017, Attempted Murder of O.I.

The evidence also supports a finding that petitioner intended to kill O.I. When the vehicle reversed and the shooting began, O.I. was outside the residence wearing blue, a color associated with Sureños. The evidence of petitioner's prior text messages suggests petitioner knew Sureños lived at the house and were the intended target of the shooting. O.I. also reported to law enforcement that he believed he was the target of the shooting due to his Sureño associations. O.I. was directly adjacent to B.J. when the shooting occurred. He was close enough to the shooting that he believed he was struck by projectiles from the bullets that hit the ground.

The foregoing circumstances suggest O.I. was a target of the shooting and are sufficient to support a finding that petitioner intended to kill him. Accordingly, substantial evidence supports the court's finding that petitioner attempted to murder O.I. during the March 24, 2017 shooting.

### D. March 24, 2017, Attempted Murder of B.P.

The inferences to be drawn regarding B.P. are somewhat less direct. The record does not reflect that B.P.'s appearance included any outward indicia of gang associations

14.

at the time of the shooting. Furthermore, B.P. did not identify himself as an intended target of the shooting. Nonetheless, B.P. was within a few feet of the apparent bullet impacts on the ground and also near the apparent bullet impacts on the cardboard on the fence. This evidence puts him in close proximity to petitioner's intended targets, B.J. and O.I.

Our Supreme Court has recognized that "a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim." (*Smith*, *supra*, 37 Cal.4th at pp. 745–746.) The "kill zone" or "concurrent intent" theory applies only where "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm— that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*People v. Canizales*, *supra*, 7 Cal.5th at p. 607.)

Here, petitioner fired approximately five shots at three individuals in close proximity to one another, and from relatively close range. Substantial evidence suggests both O.I. and B.J. were petitioner's intended targets[10] and that petitioner intended to create a zone of fatal harm in the area where these two victims were located, which area included B.P. The circumstances of the attack, including the number of bullets fired at

---

[10] We therefore disagree with petitioner's contention that the evidence fails to support a finding that petitioner had a primary intended target.

15.

relatively close range, are sufficient to support a finding that petitioner intended to kill not only his primary targets, but everyone within the zone of fatal harm.

Accordingly, substantial evidence supports the court's finding that petitioner attempted to murder B.P. during the March 24, 2017 shooting.

### E. Conclusion

Because substantial evidence supports each count of attempted murder, we affirm.

## DISPOSITION

The order denying the petition is affirmed.


GUERRA, P. T. J.*

WE CONCUR:


HILL, P. J.


DETJEN, J.

---

\* Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.